Howard T. Hogan, J.
These proceedings were tried jointly before this court on various dates between April 24, 1963 and July 23, 1963. They were: (1) a proceeding by the County of Nassau to fix the damages occasioned to Morewood Realty Corporation by the condemnation in 1961 of a portion of its land for highway and park purposes; (2) a proceeding under article 78 of the Civil Practice Act by Morewood to review the reapportionment of its remaining lands made for tax purposes in 1962; and (3) a proceeding brought by Morewood under article 7 of the Real Property Tax Law against the Board of Assessors to review the assessment of its remaining property for the tax year 1962-63.
At the time the condemnation proceeding was instituted under the Nassau County Administrative Code, Morewood was the owner of approximately 650 acres situated on the west side of Hempstead Harbor in the unincorporated area known as Port Washington in the Town of North Hempstead. For many years, Morewood and its predecessors and present licensee had engaged in extensive sand and gravel mining operations on this land. As the material was excavated it was transported by conveyor belts to a truck depot, and to docks on Hempstead Harbor from whence it was transported by barges to various points in New York, New Jersey and Connecticut. Morewood’s property was separated from the waterfront by Roslyn West Shore Drive, a public road, but it enjoyed docking rights, and tunnel easements under the road for its conveyor belts.
By two separate orders of this court, title to an aggregate of 205 acres of Morewood’s property vested in the County of Nassau on September 28, 1961 and December 27, 1961. More-wood’s licensee has continued its mining operations on the remaining 448 acres. Of the 205 acres taken, 158.2 acres are *596 reserved for park purposes and 43.8 acres by this time have been used to relocate the Boslyn West Shore Drive to the west, and to enlarge a public beach maintained on Hempstead Harbor by the Town of North Hempstead. This taking has resulted in the loss to the claimant of approximately 7,400 feet of frontage on the Boslyn West Shore Drive, which, while it does not curtail present operations on the remainder of claimant’s property, certainly will in the future adversely affect the development of the mined-out land. Also taken was 1,008 feet of waterfront.
As an aid to the understanding of this factual situation the court has caused to be prepared a picture of the area based upon an aerial photograph taken on January 11,1962. Superimposed on the photograph is a red and white line indicating the extent of Morewood’s holdings before the taking. The areas tinted orange, yellow, green and red are those acquired by the county. Beference to this picture will be made hereafter.
On July 6, 1956, Morewood executed an agreement licensing Colonial Sand & Stone Co., Inc., to mine, process and transport sand, gravel and related products on and from its land, and leasing to it all the equipment and buildings which up to then it had been using in its own operation. This agreement runs to 1996 unless the property is sooner completely mined out. The provisions of this lengthy instrument which are material to the proceeding are:
Colonial shall pay Morewood a price per cubic yard for material removed which is tied to the current average wholesale delivered price.
Minimum monthly payments are fixed.
Colonial is required to submit excavation plans in advance each year for Morewood’s approval.
Final slopes shall be maintained at safe angles of repose to prevent collapse of grade surfaces above such slopes. No excavation shall be made below an elevation of five feet above the present grade of West Shore Boad.
The licensor shall pay all taxes on the land, the licensee all taxes on the improvements.
Upon the termination of the Agreement, the licensee shall remove from the property and at its own expense finish and level grade it, complete all required reconditioning and rehabilitation, and remove all structures and equipment.
If the whole or a substantial part of the property is taken in condemnation so as to make further operations by the licensee impossible, then the Agreement terminates and the licensee shall not be entitled to any part of the award.
*597 “ If at any time the conduct of sand and gravel mining operations on any portion of the property shall be prohibited by the final judgment, decree or order of any court of competent jurisdiction, then the term hereof as to such portion shall cease and come to an end with the same force and effect as if such date were the date herein fixed for the expiration of the term hereof as to such portion of the property and all rights and obligations hereunder shall be fixed accordingly.
‘ ‘ Any portion of the property which shall have been mined out and shall not be required for the Licensee’s mining operations elsewhere on said property shall be reconditioned and rehabilitated as herein provided as soon as reasonably may be and all rights and interest of the Licensee in such portion of said property shall then cease and terminate.” (Italics supplied.)
The term of this agreement shall run until March 31, 1996 or such earlier date on which the licensee shall have completely mined the property and graded it. The licensee’s liability for monthly payments shall cease on the date the property is completely mined.
“ The property shall be considered as completely mined when it has been excavated down to an elevation of five feet above the present grade of West Shore Road. * * * except for such borders and/or slopes as are required under Paragraph Ninth.”
After the county had indicated its intention to condemn this land, but before an order of the court had been made, it entered into negotiations with Morewood, resulting in a stipulation on December 7, 1961, which, by mutual consent, was incorporated in the order of this court, entered on December 27, 1961, granting the application to condemn and vesting title in the county upon the date of entry. The interpretation of this stipulation is now disputed by the claimant and by the office of the present County Attorney. Its substance is as follows:
1. The vesting of title as to Damage Parcels Nos. 52, 52A, 52C, 52WE and 52X, was made subject to an exclusive right of way and easement in favor of Morewood and its licensees and assigns, for the purpose of entering on so much of these parcels as lie west of the proposed new Roslyn West Shore Drive (the areas colored orange and green on the court’s picture) and removing therefrom all the sand, gravel and other material which is above a prefixed elevation without any charge, fee or royalty, all of which rights and easement insofar as they relate to the area colored orange in the court’s picture, shall terminate eight years from the date of entry of the order vesting title in the county.
*598 2. Morewood, its licensees and assigns retain a permanent and exclusive right to use and maintain the presently existing tunnels under West Shore Drive, the conveyor belts and utility lines and any extensions thereof, and the county will relocate and extend such tunnels under the new Boslyn-West Shore Drive. (These tunnels permit the removal of material not only from the afore-mentioned damage parcels, but also from the property remaining to Morewood after the partial taking.)
3. The claim for damages for the taking of those portions of the aforesaid damage parcels which lie west of the proposed new Roslyn West Shore Drive shall be based upon the prevailing value of these parcels as if the sand, gravel and other material had teen removed as of the vesting date, to the prefixed elevation. (Note: This is the material which Morewood was given the right to remove over an eight-year period by paragraph “ 1 ”, supra.)
4. Notwithstanding the above, the easement over, and right to remove material from, certain areas lying within the portion of the condemned property which lies west of the line of the proposed new highway shall terminate on March 1, 1963, at which time the county shall become entitled to full possession of such areas. These areas are designed as “ squares numbers 1, 2, 3, 4, 8, 9, and 16 on the map of Bosyln West Shore Drive, dated June 28, 1961, and constitute the green area on the court’s picture. The right is reserved to More-wood to claim compensation for the value of any material above the prefixed elevation, remaining on these squares on March 1, 1963. (The area which was to be relinquished on March 1, 1963, consisted of 32.7 acres. The area which could be mined until 1969 consisted of 125.5 acres.)
5. Morewood and its licensees reserve an easement of use and maintenance of water lines and wells and electric lines and transformers, although the county may relocate them at its own expense.
Before proceeding to a consideration of the evidence it is essential that the court interpret this stipulation. In doing so it is in no way concerned with whether the contract was an improvident one.
It finds that at the date title vested to Damage Parcel 52C, a portion of which lies west of ‘1 the proposed new right of way of Roslyn West (Shore Drive,” it was covered with high sand banks extending far above the proposed road level, and that before this land could be used for park purposes, extensive grading and the removal of millions of cubic yards of sand and gravel would be required. Obviously the county *599 was not equipped to excavate and sell this valuable material, nor, apparently, was it in any hurry to commence work on this project. (At this date, more than seven months after it took possession of the aforesaid “ squares ” it has made no physical improvements whatsoever.)
It would appear that this stipulation was designed for the mutual benefit of both parties. The county would have a substantial portion of land graded without cost, and would not be obliged to pay damages based upon the enhancement of the land by these millions of yards of material. Morewood, on the other hand, could continue, through its licensee, to mine the sand for the stated periods of time and obtain the royalties as provided under the licensing agreement.
Morewood, as further consideration for these rights, agreed that its claim for damages to the ‘ ‘ squares ’ ’ should include, in addition to the basic land, the value of only so much material as remained above grade when the county took possession on March 1, 1963, and that its claim for damages as to the remainder of the land west of the line of the proposed highway “ shall be based upon the prevailing value of these parcels as if the sand, gravel and other material had been removed at the time of vesting to the underlined design elevation ’ ’. (Italics supplied.)
It finds that the parties intended by this latter clause that Morewood’s claim upon the trial of the issue of damages as to all the land taken west of the line of the new highway should include the value of the land as if it had been mined to grade on December 27, 1961, the valuation date agreed upon in the stipulation, and hence, as if it were free of the existing License Agreement. It interprets “prevailing value” as meaning the value of this type of land current on December 27, 1961, the date of the stipulation. The parties may have expected that the portion colored orange on the court’s picture would be completely mined to grade by December 27, 1969, but in any event, Morewood waived all compensation from the county for any unmined material above grade upon it.
In ascertaining the damages caused by this partial taking the court would normally follow the “ before and after ” rule, that is, it would determine the value of the whole 650 acres just prior to the taking, and then the value of the remainder immediately after, which latter amount would reflect consequential damages. However, upon the state of this record the value of the whole cannot be estimated. Two elements would make up this value — the present worth of the royalties payable during the life of the licensing agreement, and *600 the value of the reversionary interest in the land. Proof is lacking as to (1) the quantity of the removable sand and gravel on the 650 acres on the vesting date; (2) the dates upon which various portions, being mined out, would revert to the owner and become available for improvement or sale.
While it is true that payment must be made for a minimum of 850,000 cubic yards of material per year, and that the agreement runs until 1996, it is obvious to anyone observing the property and the methods employed by the licensee, that accelerated mining operations could greatly shorten this period, thus increasing both the size of its annual royalties and the value of the reversion.
Moreover, the stipulation as to the method of valuing the portion of the condemned area which lies west of the new highway is binding upon the court and makes the application of the “ before and after ” rule virtually impossible.
Under these circumstances the court will proceed to value each of the subject areas with the understanding that no claim is being made for consequential or severance damages, except in the case of Damage Parcel No. 54.
It should be noted at this time that the Acquisition Map delineates the individual damage parcels in a most unsatisfactory manner. Moreover, it does not co-ordinate with the areas described in the aforesaid stipulation. Consequently, the awards must be related to the areas rather than to the damage parcels, except in the case of Damage Parcel 54.
The areas colored orange and green on the court’s picture, contain 158.2 acres, three acres of which consist of a portion of the berm and slope required permanently for stabilization purposes and of no value for any other use. The remaining 155.2 acres are to be valued as if they were mined to grade and available for improvement on December 27, 1961, the date of vesting, as provided by the stipulation. To this valuation is to be added “ compensation by the County of Nassau for any sand, gravel or other material remaining on the 1st day of March 1963 ” on the “squares” (the green area in the court’s picture).
This area, on December 27, 1961, was surrounded on all sides by the sand-mining operations of Colonial, as both More-wood’s licensee on the south, east and west and as the owner of the land on the north. The remainder of claimant’s property after condemnation was still subject to a license to mine sand. Such operation under the Zoning Ordinance of the Town of North Hempstead, constituted a nonconforming use *601 which would continue for the duration of the License Agreement or until the property was otherwise mined out.
(While the Court of Appeals in Matter of Harbison v. City of Buffalo, 4 N Y 2d 553, held that municipalities may under certain circumstances require the termination of a nonconforming use after a period of time sufficient for the owner to amortize his investment, it would be wholly impractical to terminate this mining operation before the area had been mined to grade. The result of such termination would be to leave unsightly 650 acres scarred with ridges and valleys, of no use for any purpose whatsoever except, perhaps, for a refuse dump.)
Nevertheless, shortly before the institution of this condemnation proceeding, the Town Board of the Town of North Hemp-stead saw fit to change the zoning classification of the entire 650 acres and of the adjoining sand mines from a Residence “ C ” classification requiring a minimum lot area of 5,000 square feet, which had prevailed for many years, to Residential “ AAA ” requiring a minimum lot area of 20,000 square feet.
The circumstances under which this up-zoning was accomplished are as follows:
A 1 ‘ planning expert ’ ’ who recommended an immediate change to one-half acre residential zoning said at the public meeting of the board held on October 29, 1959, that: “ We also have an existing road pattern here and we must also think of an immediate road pattern which would possibly develop; but we also must realise that we cannot plan for a period 20 or 30 years into the future, which ivould then actually be a talcing of property.” (Italics supplied.) He continued: “ Now, the West Shore Road is a narrow and tortuous road. In the summer it takes a lot of beach directed traffic, and so any proposal must consider that one would not want a conflict of traffic, causing hazards and over-congestion on a road which can hardly accommodate its present traffic.”
This was the principal basis of the planning expert’s opinion that the area must be limited to residential uses on large plots despite the fact that minutes of this same meeting later reveal that plans were already known to be under way for the widening of West Shore Road. (It was, in fact, subsequently relocated on property taken from this claimant for that specific purpose, and was made into a divided highway, with room for unlimited future expansion. See the court’s picture for the former and present locations of West Shore Road.)
*602 Later at this same meeting, after the attorney for one of the affected property owners (not the claimant) had said: “If this upgrading perchance should devalue property and a road come in there and take a very substantial part, or if someone should be developing recreational facilities and take some property here based upon a reduced valuation by this magic wave of a wand for homes that are not needed, for homes that he will not build for quite some time, then I say that this is confiscatory.”
The Town Supervisor then indicated, according to these same minutes, that there was under consideration the location of a new road and the creation of recreational facilities on this very property, both of which would require its acquisition for a public use.
Shortly thereafter the county instituted this condemnation proceeding for the express purpose of “ Acquiring real property by the County of Nassau for highway and park purposes, for the alteration of alignment of * * * Roslyn West Shore Drive * * * and including excess lands in connection therewith ’ ’.
The court will not ascribe willfully improper motives to the rezoning of claimant’s property, but the above hardly furnished legal justification for an ‘ ‘ up-zoning ’ ’ at that time. The conclusion appears to it to be inescapable that there was a strong probability, which would enter into any purchase of the property by a knowledgable buyer, that the courts, if not a subsequent Town Board, would in an appropriate action find the one-half-acre residential zoning of this property improper, confiscatory, unrealistic and indefensible.
Moreover: (1) The residential area abutting this property to the west and 200 feet above it is already completely developed with homes on plots the great majority of which are on plots 60 feet by 100 feet, or smaller.
(2) This property, or at least a substantial portion of it, will be devoted to sand-mining operations for many years. Even if portions of it become available for improvement from time to time it is inconceivable that any residence appropriate to a one-half-acre plot would be salable if surrounded by sand-mining operations.
(3) When mined out this property will consist of a relatively level plain, slightly higher than the water level of Hempstead Harbor. Only those homes on the easterly edge of the plain will enjoy a view of the harbor. Those on the westerly border will lie under sloping banks 200 feet high. The rest of the Port Washington-Manhasset Peninsula consists of high, rolling *603 land, or shore-front, features which would seem to appeal to prospective home owners in this area. Tet, the subject property with neither of these features is the only area placed in North Hempstead’s highest zoning category.
(4) Since there can be no tie-in with any existing streets except West Shore Drive, by reason of the great differences in elevation and since approximately 120 acres in the center of the parcel are or were settling basins upon which no structure can now be erected without extensive underpinning, the site improvement costs of developing this land for half-acre building plots to be sold under competitive conditions would appear to be prohibitive.
(5) A town incinerator, the location of which has been the cause of bitter and highly publicized litigation, now ended by the Court of Appeals, will soon be built at the head of Hemp-stead Harbor, quite near the subject property. Opposition to this location came principally from local homeowners who insisted that the value of their properties would be substantially depreciated.
The Nassau County Planning Commission which made a comprehensive study and analysis of the county’s industrial status in 1961 and 1962, in its report dated August, 1962, classified the vacant industrial land in each community according to the type of access, topography, lot size, zoning restrictions, tax rates and public utilities. It said: ‘1 Since current estimates of vacant land indicate that only 15% of the County’s area is still vacant, it is necessary to provide intelligently for the best possible use of this land, especially to satisfy the needs for industrial development.”
The report dealt specifically with the subject property as follows:
“ There are certain non-conforming uses along Manhasset Bay that should be included in the industrial zone.
“ The greatest amount of non-conforming uses are the 800 acres of sand mining operations adjacent to Hempstead Harbor. When the sand supply is depleted, this area could provide an ideal setting for a large industrial complex. The sand bank has created a natural buffer from the residences to the west and there will be a county park on the north boundary.
“ Water access would be available for waterfront plots on either side of the town beach. There is no rail service.
“ The main route leading through this area is Shore Road which is being relocated and improved.”
A planning consultant called by the claimant testified that in view of the scarcity of unimproved property the develop *604 znent of this unique area would have a tremendous impact on the economic and social framework of the community, the town and the county. He felt that 650 acres were too extensive to be devoted to any one particular use, and he suggested an elaborate but well-conceived plan of apportionment into industrial, commercial, apartment house and single-family residence zones.
However, it is not within the power of the court, if it strikes down an improper zoning ordinance, to replace it with one conforming to its own ideas. This is a duty resting solely with the municipal legislative body. Nevertheless, if it fears that such a body may persist in its error when adopting new regulations, it can state by way of guidance what use restrictions might share the infirmities of the old ones. This was so held by Mr. Justice Gulotta of this court in Wishner v. Burns (N. Y. L. J., March 4, 1963, p. 20, col. 6, affd. without opn., 19 A D 2d 861).
So that this Town Board, although not a party hereto, understands the principle by which this court is guided, it sets forth the rule stated by the Court of Appeals in Arverne Bay Constr. Co. v. Thatcher (278 N. Y. 222). Quoting from the opinion of Mr. Justice Holmes in Pennsylvania Coal Co. v. Mahon (260 U. S. 393) it said (pp. 231-232):
“ In the prevailing opinion in that case, Mr. Justice Holmes pointed out that ‘ the general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking ’ * * * and here Mr. Justice Holmes gave warning that ‘ we are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change ’ * * *.
“ The warning of Mr. Justice Holmes should perhaps be directed rather to Legislatures than to courts; for the courts have not hesitated to declare statutes invalid wherever regulation has gone so far that it is clearly unreasonable and must be ‘ recognized as taking ’• * * * Aw ordinance which permanently so restricts the use of property that it cannot be used for any reasonable purpose goes, it is plain, beyond regulation, and must be recognised as a talcing of the property.” (Italics supplied.)
It should be borne in mind that a zoning ordinance in and of itself does not establish market value either for assessment or condemnation purposes.
*605 The desire to preserve the essential character of the community, or to prevent overcrowding, or higher school taxes, must yield to the fundamental constitutional guarantee that an owner may not be deprived of all reasonable use of his property without receiving just compensation for such loss.
Certainly there would be a de facto confiscation if the development of this parcel, or the remainder of claimant’s 620 acres was restricted to any residential use on plots larger than those 6,000-square feet plots predominating on its western border.
Perhaps the Town Board, the various civic associations, the school boards and the individual property owners in this community might come to the conclusion that the impact of a large number of new homes on the tax rates and the public facilities should be softened or even avoided by a comprehensive rezoning of this area which would make room for industrial and commercial uses.
The court having concluded that any zoning more restrictive than the above would be improper, finds that a willing buyer would be influenced by the strong probability of a downzoning, and, giving weight to this and the proof of value furnished by the many sales of various types of land put in evidence by both sides, finds that the fair market value of these 155.2 acres, before site improvement costs, is $32,500 per acre, which unit price includes an allowance of $500 for plottage, a factor of great importance to any large-scale development of industrial, commercial or residential land.
The value of the sand, gravel and other material remaining on the “ squares ”, the green area in the court’s picture, as of March 1, 1963, must now be added to this pursuant to the aforesaid stipulation. The land consists of 32.7 acres, the testimony of claimant’s engineers was that they contained approximately 1,617,217 cubic yards of material above grade and of the county’s witness Boshkov, that they contained approximately 1,700,000 cubic yards.
The value of this unmined material was in sharp dispute. The county’s witnesses testified that 170 samples had been obtained by borings, and analysis showed them to be of a quality which would meet neither the specifications of Nassau County nor the Long Island State Park Commission without processing to remove clay, silt, and those sand particles which were finer than No. 200 mesh. They estimated that 20.3% of the deposit was clay and silt, and that it was not economically practical to process material containing more than 4% of these. *606 From, three to five gallons of water would be required per pound to wash out the minus 200 mesh material. The substance thus removed could not be used even as fill, because it was unstable when wet.
The claimant’s witness on the other hand, said that this extremely fine material, after it was washed out, had a commercial value in the manufacture of asphalt in New York City and could be used for plaster and mortar mixes.
The question which must be decided preliminarily is: Are claimant’s damages for the loss of this material to be computed at the rate per yard which Morewood received as a royalty from Colonial? The court holds that they are not to be so measured, first, because the stipulation with the county which could have been explicit on this point and fixed this unit as a measure of its damages, said merely: “Notwithstanding anything herein to the contrary it is further stipulated and agreed that More-wood Realty Corporation reserves the right to compensation by the County of Nassau for any sand, gravel or other material remaining on the 1st day of March, 1963 above the underlined design elevations in the aforesaid area and reserves the right to file a claim for damages against the County of Nassau for any such sand, gravel or other material remaining above the underlined designed elevations and not removed by the 1st day of March, 1963.”
Second: There is no proof in the record that Colonial, before the expiration of the License Agreement, would have so exhausted the rest of the 650 acres by its mining operations that it would be compelled to resort to this 32.7-acre area in order to fill its minimum quota. Hence, it was by no means established that Morewood’s actual damage was the loss of royalties on 1,700,000 cubic yards of material at the rate fixed in the License Agreement.
Third: The court is not satisfied from the testimony of Morewood’s witness that this material was of a quality in any way comparable with the sand and gravel deposits throughout the rest of claimant’s property.
Fourth: When claimant executed the stipulation for the valuation of all the property taken west of the new highway, it agreed that it should be treated as if mined out, and then the value of the remaining materials on the “ squares ” should be added. Paragraph “Twenty-seventh” of the License Agreement plainly states that when any portion of the property has been mined out the interest of the licensee (and consequently its obligations) cease and terminate.
*607 Upon all the evidence and upon personal inspections of the site by the court, it finds that the test borings substantiate the county’s estimate that it would be economically practical to mine and process only about 100,000 cubic yards of sand and gravel at this site, and that the value of this, before mining, is 25 cents per yard. Unquestionably, more of this could be recovered by selective mining and additional processing, but the cost would be prohibitive.
The county’s witness, Sweeney, testified that the clay and silt left after refining was worthless as fill because “if it were wet it flows like mush.” However, if the sand and gravel in the remaining 1,600,000 cubic yards were not removed, this would not be true, and they would have a commercial value for such purpose. Although neither party offered any proof on this point the court, from its knowledge gained in other proceedings, is aware that there is a continuous demand for fill in this area. Based upon this same knowledge, and the fact that transportation by both land and water is available at the site, it finds that this 1,600,000 cubic yards of unrefined material has an average value of 10 cents yer yard in situ.
Next to be considered is the land lying east of the new highway, consisting of 43.8 acres, colored yellow on the court’s picture. This parcel was not covered by the stipulation between the parties. Consequently, valuation must be based upon its actual condition on the date of the vesting of title — December 27, 1961, and upon the fact that it was subject to the License Agreement.
In the absence of proof of any sales of comparable property and because it was incumbered by the License Agreement, the court may not evaluate it merely as unimproved land enhanced by the presence of sand deposits, but must consider the loss of both royalties and the value of the reversionary interest in the land. No other method will fairly compensate the owner for the damages actually suffered by the taking.
It was testified by claimant’s engineer that on January 11, 1962, a few days after title had vested in the county, there were 1,121,637 cubic yards of material above grade on this parcel. A photograph of the area, taken on February 27,1963 shows that this had been removed by that date. The witness further testified that it was used by the county for the beds of the new divided highway and for the expansion and extension of the public beach. This is not disputed.
At the rate of $0.24703 per cubic yard, the owner lost royalties in the amount of $277,078.
*608 It is a fair assumption that if the county could mine and redistribute these 1,121,637 cubic yards of material within the period of 13 months, then the licensee certainly could have removed and processed it within two years. It also may be assumed that the licensor, exercising its right under paragraph “Eighth” of the License Agreement, would have caused this parcel to be mined out at an early date, since the grading of this property, fronting as it did on the old highway, would have made the interior deposits more accessible. Moreover, of all the land owned by the claimant, this parcel, for obvious reasons, would lend itself best to improvement once it had been mined out and returned to the owner.
On December 27, 1961, claimant had the right to receive a royalty totaling $277,078 for 1,121,637 cubic yards of material, or $138,539 per year for two years. It would be required to pay taxes on this land, which the court ascertained was based in 1961 upon an assessed valuation of $3,250 per acre and a combined tax rate of $8,951 per $100. The net return would be $138,539 less taxes of $12,742, or $125,797 per year. On December 27, 1961, the right to receive this income for two years at 5% interest would be $233,856, that is, the sum of $233,856, invested at 5% per annum, would yield two annual payments of $125,797 each.
Two factors make the mined-out land which would have reverted to the owner substantially more valuable than the land covered by the stipulation upon which latter the court already has placed a value of $32,000 per acre. First, it had on the vesting date nearly one mile of frontage on the west side of the old highway, making site improvement costs substantially lower. Second, at that time the public beach had not been extended, so that this parcel was separated from the water line of the harbor only by the width of the old highway, a feature which would enhance it for almost any type of development.
Upon the likelihood of a change in the zoning restrictions and upon the evidence of sales of comparable unimproved acreage, the court finds as of December 27, 1961, a value of $38,000 per acre which includes an allowance of $500 per acre for plottage. This results in a total value of $1,664,400. It computes the present value (Dec. 27, 1961) of this reversionary interest, at 5%, to be $1,509,659.
Situated partially on this 43.8-acre parcel is a two-family dwelling owned by Morewood but under lease to John and Gavina Chessa who in turn sublease the second-story apartment for $100 per month. The acquisition line intersects this *609 building, cutting off a portion of tiie front enclosed porch and of the dining room, the entire living room and the basement stairway of the ground-floor apartment, and the entire living room and a portion of one bedroom and of the second-floor stairway, as well as one quarter of the one-half acre of land leased with the building. The loss of this land necessitated the relocation of a driveway, a fuel oil tank and a cesspool by the tenant. Possession of the house and garage have not yet been disturbed by the county but the property may be required at any time.
The lease which Morewood gave to the Chessas when it purchased their property in 1959 provided that they could occupy the premises rent free until 30 days after the death of the survivor of the two, with the right of election in their children, if the survivor died before January 16,1969, to occupy it until that date or until 30 days after the death of the survivor of the electing children.
It provided further that if the whole or a substantial portion of the premises was condemned, all rights of the tenant under the lease would terminate, but he would be entitled to the value of the unexpired term out of the condemnation award.
Obviously substantial portions of the land and building were taken. The court holds accordingly, that the lease was terminated when title to these portions vested in the county on December 27, 1961, even though the Chessas at this time are still in possession on sufferance.
Mrs. Chessa, the younger of the two lessees, was 59 years of age at that time. Her life expectancy, according to the American Experience Table of Mortality, was 14.74 years. The appraisers for Morewood and the Chessas agreed that the second-story apartment was producing a rental of $100 monthly and that the fair rental value of the rest of the premises was $175, with the result that the gross income was $275 per month, or $3,300 per annum. The tenants were required to pay all taxes and assessments, and to insure the premises for the benefit of the owner. Morewood’s appraiser calculated these expenses, including the cost of water, at $940 per annum. The lease, however, provided that: 1 ‘ The Landlord shall, at its expense, supply water to the demised premises for customary household use throughout the term hereof.” The item of repairs and maintenance for this 75-year-old house was overlooked, although this was the tenants ’ responsibility.
The court finds the fair net value of the leasehold to have been $2,200 per annum. The present value of the right to *610 receive this sum for 14.74 years based upon the investment of the lump-sum payment at 5%, is $22,572.
A nominal award of $1 is made for the loss of Morewood’s reversionary interest in the portion of the leased premises which was taken. When it purchased this property from the Chessas, the consideration was twofold: $25,000, and a leaseback for the life of the survivor of the two Chessas, at no rental, except that the tenants were obligated to maintain the property and pay real estate taxes. Consequently, the landlord lost no income by the taking. On December 27, 1961, it had only a reversionary right, maturing in approximately 15 years, to possession of one-half an acre of land and a frame dwelling which then would be about 90 years old and of little value.
If the condemnation had not intervened, the landlord would have had to wait for 15 years to regain the use of its property. The taking cancelled the lease, gave it the right to immediate possession of three-eighths of an acre, and compensated it for the loss of one-eighth of an acre in which it had had only a reversionary right.
Because the lease, made with an awareness of the possibility of condemnation, provided that the tenant would be compensated for the loss of its leasehold in that event, this condemnation merely accelerated the payment of the second part of the purchase price, i.e., the value of the leaseback. The landlord, in return, received possession and control of three-fourths of its property 15 years sooner than anticipated and was compensated for the loss of the remaining one-fourth of the property. Consequently, it suffered no measurable damages.
Damage Parcel No. 54 shown in red on the court’s picture is a narrow strip fronting on the east .side of West Shore Drive. It is part of a larger plot which runs from the road easterly to the mean high-water mark of Hempstead Harbor and is considerably below the grade of the road. The record, principally the exhibits in evidence, when reread by the court after the hearing had concluded, indicate conflict as to the area involved in the acquisition, the area remaining thereafter, and the extent of Morewood’s interest in each. Moreover, the availability of this property for docking purposes was not fully explored by the parties. Accordingly, the court accepts at this time the figures set by the county’s expert witness, Matthews, which fix the area of the large parcel at 6.8 acres, the area of the damage parcel at 2.9 acres, the value of the whole before acquisition at $122,400, and the value after at $54,000. He placed direct damages at $52,200 and severance damages at $16,200, for a total of $68,400.
*611 The parties will be afforded the opportunity, upon the hearing of objections, to furnish further proof upon these issues.
The findings of the court, tabulated without reference to damage parcel descriptions, except in the case of Damage Parcel No. 54, for the direct damages at $52,200 and severance damages at $16,200, for a total of $68,400.
The findings of the court, tabulated without reference to damage parcel descriptions, except in the case of Damage Parcel No. 54, for the reasons previously stated, are as follows:
Land covered by the Stipulation
155.2 acres at $32,500 per acre................ $5,044,000.00
Three acres berm and slope (nominal value)...... 300.00
Mineral deposits remaining on “ squares ”
(100,000 cu. yds. at 25^; 1,600,000 yds. at 10^) 185,000.00
Land east of the new West Shore Drive 43.8 acres at $38,000 per acre, computed as pay-
able in two annual installments............... 1,509,659.00
Loss of royalties for mineral deposits on 43.8 acres
payable over two years....................... 233,856.00
Value of Chessa leasehold (payable to tenant by
landlord) ................................... (22,572.00)
Landlord’s right of reversion of portion of leased
premises taken in this proceeding.............. 1.00
Damage Parcel No. 54........................ 68,400.00
A nominal allowance of $1 for each of the work and drainage easements is made. No proof as to these was presented by either party.
No satisfactory proof of the value of any improvements was presented and consequently, no awards are made for them.
Submit tentative decree accordingly.
# *
Morewood’s proceeding against the Board of Assessors brought pursuant to article 78 of the Civil Practice Act seeks a review of the apportionment of its tax assessment for the year 1961-1962, which apportionment was necessitated by the acquisition of part of its land on December 27,1961, as aforesaid. The respondents object to this proceeding on the ground that the assessment had been finally fixed on August 1, 1961, that petitioner did not contest it within 30 days thereafter, and that article 7 of the Real Property Tax Law provided an exclusive remedy, and this relief was barred by section 702 thereof.
*612 Petitioner, however, is not seeking a review of the assessment hut of the apportionment of the assessment, which was not made until February, 1962. The Real Property Tax Law does not prescribe a remedy, so the petitioner properly instituted this proceeding under article 78 of the Civil Practice Act, now article 78 of the CPLR (J. W. Enterprises v. Boyland, N. Y. L. J., March 10, 1953, p. 794, col. 8).
The application is based upon eight alleged errors: (1) Respondents failed to consider that the more valuable portion of petitioner’s property was taken in the condemnation proceeding; (2) that the berm and slope area, which is of no use for development purposes, was treated in the same manner as the rest of the remaining land; (3) that 146.7 acres arc situated in the present and the former settling basin and, being unstable, are of little use; (4) that adjacent properties are more highly developed and more valuable, but are assessed on the same basis as petitioner’s remaining lands; (5) that no allowance has been made for the fact that the condemnation resulted in the loss of 7,147 feet or more of highway frontage, seriously affecting the value of the remaining land; (6) the loss of 1,050 feet of water frontage impairs the value of the remaining land; (7) two of the tax lots, to wit, Lots 55A and 55B are not petitioner’s and should not have been included and (8) certain improvements actually are on lands acquired by the county but assessed to the petitioner.
The respondents admit that tax Lots 55A and 55B, assessed at $1,616, are not owned by petitioner and were erroneously assessed to it, and that certain improvements, assessed at $41,233 were actually on lands taken in the condemnation proceeding and should not have been included in the new assessment.
Petitioner proceeds upon the theory that since some of its land is of little or no use for building purposes its assessed valuation should reflect this. The Assessors, however, must base their appraisals to a large extent upon the current use of this property, a sand-mining operation, rather than speculate as to a future use. The operation is a profitable one, although there may be now or in the future, even more profitable uses to which the land can be put.
It is true that the berm and slope is not suitable for building and that the new settling basin is too unstable at present for such use, but both are integral, necessary parts of the present mining operation, and should be taxed as such. The old unused settling basin, however, can be of no present use because of *613 its unstable condition and the apportionment should take this into consideration.
It is clear from the fact that 205 acres of petitioner’s approximately 650 acres were taken in the condemnation proceeding, and 69.5% of the total assessed valuation was allocated to its remaining 445 acres, that respondents used, in principle, a uniform per-acre value for the whole of the petitioner’s property, and in reapportioning it after the condemnation of a part, applied this uniform per-acre value to the remainder without regard to the obvious fact that the part taken contained little or no berm and slope area and no new or old settling basins and had the added advantage of greater accessibility to the old West Shore Drive and to the waterfront. It was, for sand mining, and other purposes, more valuable than the, interior land.
Upon all the evidence produced at the joint trial the court finds that the apportionment was improper and inequitable and placed upon the petitioner a disproportionate part of the tax burden for the tax year 1961-62. It will direct the respondents to reapportion this tax assessment and to eliminate from it tax Lots 55A and 55B, and all improvements which they now concede to have been included in the condemnation proceeding.
It will further direct respondents to give due weight to the fact that the area of the old settling basin, approximately 70 acres, is of no present use and of little value for any future purpose without substantial rehabilitation, that the slope and berm area, approximating 75 acres, can never be productive of income and has only limited value as a stabilizer which permits the continuance of the sand-mining operation. The new settling basin,- however, plays an active part in such operation and its value should be fixed accordingly.
It will further direct the respondents to take into account the fact that the loss of 7,147 feet or more of road frontage has impaired the assessibility of a substantial part of petitioner’s remaining property and has diminished its present value for sand-mining purposes.
Submit judgment accordingly.
# # #
Petitioner’s remaining proceeding is one to review the tax assessment placed upon the property remaining after the condemnation for the tax year 1962-63. The court states at the outset that a method of evaluation must now be used which differs substantially from that adopted in the condemnation *614 proceeding. There the property taken was to be valued at its highest" and best use and the probability of rezoning was an element to be considered.
For taxation purposes, however, these rules do not apply. The Assessors may not give substantial weight to the fact that this property could produce an even greater income if devoted to another use. They are required to value it as it existed and was being used in 1962. To illustrate: a property owner may maintain a ‘ ‘ taxpayer ’ ’ on his land without receiving an assessment based on the fact that that land could be used for an apartment house or a multistory oEce building. If the use or the improvement of land is reasonable and adequate, then it should be assessed accordingly.
Nor may the Assessors consider the possibility that at some unspecified time the zoning of the property might become less restrictive. They are to value the land as it exists on a date fixed by law, and that valuation continues throughout the tax year.
This disposes of the contention of the petitioner that the area occupied by the new settling basin and certain other areas should receive lower assessments because they cannot be used for building sites without substantial expenditures for stabilization purposes.
The Assessors appear to have assessed the property solely upon the basis of its current use as a sand mine, without regard to its possible increase or decrease in value at some future time. The court holds that this is the proper method to be employed.
An examination of the assessments' of the individual tax lots shows the following:
Lots 56A, 56B and 58 are harbor-front properties and their assessments at the rate of $7,500 per acre, 36% of what the Assessors considered their actual value, were, in the opinion of the court, by no means excessive.
Lots 1001, 1002 and 1003 are narrow strips of waterfront, which, because of their lack of depth and their swampy condition, were assessed at two cents per square foot, likewise a reasonable rate under all the circumstances.
Lot 995, consisting of approximately 438 acres contains the remaining sand deposits, the two settling basins, the berm and slope, and the sites on which the hoppers and other refining and loading machinery are located. This was assessed at the uniform rate of $3,250 per acre, indicating an actual value of approximately $9,000 per acre. This is by no means excessive when applied to the land used in the profitable sand-mining operation, and, as aforesaid, the court considers the new settling *615 basin and the berm and slope integral parts of that operation and necessary to its continuance. However, this is not true of the old settling basin, which, apparently, is no longer useful for the purposes of the owner, or, for that matter, any other purpose unless and until it has been rehabilitated by fill and compaction. The fact that this may be economically feasible at some future date does not warrant an assessment at this time equal to that borne by the productive areas of Lot 995. The assessment, accordingly, is reduced to $1,625 per acre for the approximately 70 acres comprising the old settling basin.