Howard T. Hogan, J.
This is a consolidated tax certiorari proceeding instituted by B. H. Macy and Co., Inc., petitioner herein, which seeks a reduction in the assessed valuation of certain real property in the Boosevelt Field Shopping Center located in the Town of Hempstead, Nassau County, New York.
The years under consideration for the review of the real estate tax assessments are: 1957-58; 1958-59; 1959-60; 1960-61; 1961-62; 1962-63.
*567 The real property comprises 3.6217 acres known and designated as Lots 198 and 199 in Block A, Section 44, on the land and tax map of Nassau County. The property is now improved with a three-story and basement air-conditioned department store of modern design and construction. The subject premises is situated about the center of Roosevelt Field Shopping Center complex. The entire area of Roosevelt Field Shopping Center approximates 160 acres of land bordered on the north by Old Country Road, on the east by Meadowbrook Parkway, on the west by Clinton Road and on the south by Stewart Avenue.
A portion of the shopping center lies within the Incorporated Village of Garden City.
There is access from all of these major arterial highways to the shopping center. Service roadways, malls, parking areas and tunnels provide access to the various improvements erected in the Roosevelt Field Shopping Center. There are facilities for parking approximately 11,000 automobiles. Most of the buildings, except that of the petitioner and of Gimbels Department Store, which is in close proximity, are improved with one-story store buildings and most of these have basements. The shopping center has been developed with many nationally known retail stores, including F. W. Woolworth, S. S. Kresge, Horn & Hardart, Franklin Simon, Wallachs, Howard Clothes, Chandler’s Shoes, Florsheim Shoes, Thom McAnn Shoes, Kitty Kelly Shoes, Ripley Clothes, Walgreen Drugs, Loft’s Candies, Fanny Farmer Candies, Grand Union and numerous other national chains. In addition, there is a five-story office building owned by the Franklin National Bank with restaurant and other facilities on the top floor. Recently, a modern motion picture theatre has been erected.
The total gross area, including the garden shop and exclusive of the third floor, which was partially completed on May 1, 1962, and occupied in September, 1962, contained approximately 334,000 square feet, with a cube of approximately six million feet. Of this 334,000 square feet, there are 60,000 square feet of terrazzo flooring and 4,000 square feet of ceramic tile. The remainder of the flooring is covered principally either by vinyl or asphalt tile.
The area in the basement has an interior truck entrance with loading platform, adjacent to which are enclosed areas for the storage of merchandise, building equipment rooms, lavatories and maintenance rooms. The ground floor has modern show windows in granite base, polished steel entrances. All entrances have aluminum canopies. The basement area, comprising approximately 75,000 square feet, is devoted to general sales, *568 has vinyl tile floor covering, plaster walls and acoustical tile ceiling. At the mid-center of the basement there is an escalator to the first floor and there are, as well, four enclosed stairways. The basement is extended under an area devoted to garden merchandise and supplies. The first and second floors of the structure contain approximately 100,000 square feet each with plastered walls and acoustical ceilings. Likewise, there is an escalator about the center of the main floor providing access to the second floor and there is now a third escalator from the second floor to the third. All floors contain about the same number of square feet and these, likewise, are covered with composition floor tile and with acoustical tile ceilings. All outer areas to a depth of about 40 feet are partitioned for service rooms, including offices, lavatories and employees’ rest rooms.
The County of Nassau for each of the tax years involved in this proceeding assessed the subject property as follows:
Section 44 Block A Lots 198-199
Land Land and Improvements Improvements
1957- 58.................. $599,702 $2,509,250 $1,909,548
1958- 59.................. 599,702 2,509,250 1,909,548
1959- 60.................. 599,702 2,509,250 1,909,548
1960- 61.................. 599,702 2,509,250 1,909,548
1961- 62.................. 599,702 2,509,250 1,909,548
1962- 63.................. 599,702 2,594,250 1,994,548
The parties hereto have stipulated to a ratio of 36%; hence, the only issue is the actual value of the property (land and buildings) on the first day of May in each of the years involved.
By deed dated July 15, 1955, and recorded August 22, 1955, in the County Clerk’s office of Nassau County in Liber 5857 of Deeds at page 587, R. H. M. Properties Corp. acquired title to the subject property from Roosevelt Field. At the time of the conveyance, no monetary consideration was paid and in lieu thereof, the parties entered into an operating agreement wherein and whereby R. H. Macy & Co., Inc., agreed to maintain and operate a department store in this regional shopping center, which it proceeded to do, and it was committed to contribute a •minimum of $100,000 toward the construction of a tunnel connecting with its property and other areas. On August 29, 1956, R. H. M. Properties Corp. entered into a leasehold agreement with R. H. Macy & Co., Inc., covering the subject property and improvements for a term of 30 years with renewal options of 4 successive periods of 15 years each.
The rent reserved under the lease was $480,000 per year ■minimum, commencing July 31, 1961. In addition to the mini *569 mum rent, the lessee was to pay 3% of the volume of business up to $13,200,000 per year; 2%% of the volume of business from $13,200,000 to $19,800,000 per year and 2% of the volume of business in excess thereof.
In addition, the lessee was required to pay all real estate tax assessments, water and meter charges and Government charges. The lessee was further required to pay all charges imposed in connection with the operating agreement with Roosevelt Field, Inc.; keep in force public liability policies with limits of $100,000-$!,000,000; maintain all improvements in good condition and make all structural and ordinary repairs; carry insurance for loss or damage by fire at 80% of the insurable value; and maintain property damage insurance to a limit of at least $200,000. This, of course, was not an “ arm’s length ” lease.
R. H. M. Properties Corp., as of January 1, 1957, mortgaged the subject premises to Massachusetts Mutual Life Insurance Co. to secure $5,500,000, 4%%, note due January 1, 1982. The mortgage covered the land and the improvements and was made subject to the afore-mentioned lease and further subject to the declaration of restrictions made by Roosevelt Field Inc., dated February 14, 1951, and modified August 24, 1953, January 10, 1955, May 7, 1955 and September 2, 1955. It was further subject to an easement reserved to Roosevelt Field, Inc., dated January 15, 1955 and corrected September 28, 1955, and subject to an operating agreement dated September 28,1955. However, as this court has previously stated, the presence or absence of a mortgage is of no concern to the tax assessor.
The aforesaid operating agreement between Roosevelt Field, Inc., and R. H. Maey & Co., Inc., which was recorded on August 22, 1955, in Liber 5857 at page 451, among other things, gave to the lessee the right to use the parking areas of Roosevelt Field, Inc., and the right to use all of the access roads, in exchange for which the lessee was required to contribute to the cost of maintenance thereof under a formula based upon its floor area. Among the costs of maintenance which the lessee agreed to assume were fire, liability, compensation and property damage insurance, lighting poles repair and maintenance, including snow removal. In addition, there were the landscaping, malls, sidewalks, ramps, stairways, plus a proportionate share of the real estate taxes imposed upon the Roosevelt Field Shopping Center, to be determined on the same basis as the ratio of the total floor area heretofore noted. Roosevelt Field, Inc., under the agreement, obligated itself to provide seven parking spaces for each 1,000 square feet of rentable floor area, including the basement and to provide 2 square feet of parking for *570 each 1 square foot of office space; to maintain the entire shopping center in single ownership; to limit the height of any building erected in the shopping center so that the same would not exceed the height of the Macy building, and to keep unincumbered the parking areas and access roads.
R H. M. Properties Corp. engaged Turner Construction Co. to construct the department store building on its premises. The agreement entered into between R H. M. Properties Corp. and Turner required the latter to perform all of the services and do all of the work either directly or through subcontracts necessary for the proper construction of this improvement at Roosevelt Field Shopping Center. A copy of this agreement was offered in evidence and marked “ Court’s Ex. K.” The articles of agreement relative to the construction included an assignment by the lessee R. H. Macy & Co., Inc., to its parent, R. H. M. Properties Corp., of certain contracts which R. H. Macy & Co., Inc., had entered into with Ingnel’s Steel Construction Co. governing the structural steel and the erection thereof at the project site and contract between R. IT. Macy ■& Co., Inc., and Bethlehem Steel Co. covering supply and delivery of certain additional steel required for the project.
Leases of other department stores located in Nassau County, such as Lord & Taylor at Garden City, Gertz at Hicksville, or Ohrbachs at Roosevelt Raceway, were analyzed and submitted as comparable. It is to be noted that petitioner’s expert conceded ‘1 there is really no established rental pattern to these leases ” — furthermore, the percentage of rent based upon volume varies from store to store. For the purposes of his appraisal, he considered $1.15 per square foot as the fair rental value of the property or a total net rental value of $384,000 which, capitalized at a rate of 8.5%, would result in a value of $4,500,000. This method, known as the income approach, the expert discarded since it exceeded his value found by the summation method.
In his summation method he adopted the reproduction costs found by petitioner’s consulting engineer to which he added his own ascribed land value. For each of the years in question, he found as follows:
May 1, 1957
Land: 3.6217 acres at $35,000........................... $126,750
Improvements: (Jacks Valuation)....................... 4,200,500
$4,327,250
*571 May 1, 1958
Land: 3.6217 acres at $40,000........................... $144,860
Improvements: (Jacks Valuation)....................... 4,219,850
$4,364,710
May 1, 1959
Land: 3.6217 acres at $45,000.. .. $162,975
Improvements: (Jacks Valuation) 4,287,200
$4,450,175
May 1, 1960
Land: 3.6217 acres at $50,000.......................... $181,085
Improvements: (Jacks Valuation)....................... 4,253,300
$4,434,385
May 1, 1961
Land: 3.6217 acres at $55,000........................... $199,190
Improvements: (Jacks Valuation)....................... 4,162,125
$4,361,315
May 1, 1962
Land: 3.6217 acres at $60,000.......................... $217,300
Improvements: (Jacks Valuation)....................... 4,157,000
$4,374,300
Petitioner’s consulting engineer, in appraising the improvements, testified that although Turner Construction Co. had the contract and did, in fact, construct the building, he did not examine the Turner books and records relative to the cost of this construction. On cross-examination, he was asked:
“ Q. Did you ask for the Turner books from someone or of someone? A. I asked Macy if they could get the Turner books and they said they could not.
“ Q. So you were limited, you only had these figures, is that right? A. That is correct.
“ Q. But you do agree that if you were able to check the Turner books, you might have an understanding of these various discrepancies, is that right? A. If I were able to check the Turner books, I would know what these figures meant.”
There were many discrepancies between the engineer’s own estimate and the Turner figures which, when produced in evidence, were inexplicable to this witness. As an illustration, Turner’s charge for heating, ventilating and air conditioning was $287,000 in excess of the consulting engineer’s estimate. His answer indicated that this part of the work was an over-improvement. Likewise, he did not include in his valuation any vinyl or asphalt tile floor covering, valuing only the terrazzo and ceramic tile. Because he believed that the air conditioning *572 was far in excess of what was required, he did not give its full reproduction cost. The engineer, in his appraisal of the sprinkling system, likewise rejected Turner’s charge therefor, although it was available to him, because he did not know “ how they figure costs ”. According to this witness, the total cost of the building to Macy was $4,904,890, which sum was paid to Turner. This figure included Turner’s fee.
This gentleman’s valuation was based upon his own judgment and experience. He was not guided by Turner’s figures in connection with the cost of construction, which figures indicated, an authorized budget and accumulated commitments to November 2, 1957, of $5,937,509. However, respondents’ professional engineer engaged to analyze these costs arrived at a total for the improvements of $6,167,000.
Petitioner’s real estate expert, in arriving at his valuation of $1.15 per square foot, relied upon certain leases, among them, the Gertz lease in the Mid-Island Shopping Plaza in Hicksville, New York, approximately six miles distant. While it is true that the Gertz Department Store is located in a regional shopping center, it is the court’s considered judgment that the two are not comparable as to the area from which they draw or as to size.
The gist of the testimony of both real estate experts called by the petitioner, based on an analysis of alleged comparable leases and values of the improvements as supplied by petitioner’s engineer, arrived at a value of $1.15 per square foot and $1.25 per square foot, respectively, which capitalized at 8%% would indicate a fair market value, not in excess of $4,700,000.
The county’s real estate expert appraised the market value of the property as if free and clear. In arriving at his appraised value, he gave consideration to many factors that would tend to influence such value. Included among these were location, existing and projected competition, neighborhood trends, transportation and equity return rates, as well as population trends, and Nassau County’s median income figures which indicate that it has a higher per capita income than any county within the State of New York.
The county’s expert submitted four alleged comparable leases. However, none of these were of a department store such as the subject premises within a regional shopping center. His testimony concerning the petitioner’s store at the Walt Whitman Shopping Center was of extremely little value because the data he used were hearsay and too speculative.
What an “ average department store ” might do in this particular location is conjectural.
*573 The building expert called by the respondents conceded on cross-examination that he had not examined the specifications, although they were comprehensive and described the materials and methods of construction. His appraisal likewise was based upon misinformation in some instances. He evidenced no knowledge of the type of plumbing fixtures and conceded that in his appraisal of the elevators and escalators he gave these a value of $418,000, yet in his appraisal of the same number of escalators and elevators of comparable quality and size for the Grimbels Department Store close by, he valued the latter at about half the same figure.
The respondents’ real estate expert, adopting the building figures given to him by respondents’ building appraiser, arrived at the following values for each of the years in question:
The market value as of May 1, 1958 is:
Land ............................$1,740,000
Building......................... 5,460,000
Total........................$7,200,000
The market value as of May 1, 1959 is:
Land ............................$1,800,000
Building......................... 5,400,000
Total........................$7,200,000
The market value as of May 1, 1960 is:
Land ............................$1,900,000
Building......................... 5,300,000
Total........................$7,200,000
The market value as of May 1, 1961 is:
Land ...............■.............$1,980,000
Building......................... 5,220,000
Total........................$7,200,000
The market value as of May 1, 1962 is:
Land ............................$2,050,000
Building......................... 5,150,000*
Total $7,200,000*
*574 The court was unable to evaluate this property upon the basis of earned net income, for the reason that the petitioner refused to open its books either to the court or to the respondents, despite the latter’s request. This fact and the absence of evidence of sales or leases of truly comparable properties made it necessary for the court to base its valuation principally upon the reconstruction costs, less depreciation, as shown by Turner’s figures and upon the judgment of the appraisers. In so doing, the court allowed a straight-line depreciation of 2% which in this particular situation was more than offset by increasing land and building construction costs as well as market values generally.
The land is unique in that it is about center of one of the largest shopping centers located in the “hub” of Nassau County. There are no sales of truly comparable land. One cannot be guided entirely by values on Franklin Avenue in Garden City, or by land values in other shopping centers that do not have the same attributes of the subject property. These values are of some assistance, but by no means controlling. Consequently, the court is impelled to weigh all of these factors as well as location and type of improvement to arrive at a fair market value.
Certainly, the Macy building is an adequate improvement of the land. It represents the controlling factor in the determination of the increase in land value during each of the years under review.
Although the third story was not completed on May 1, 1962 (the effective date of assessment), it was sufficiently far enough along so that occupancy was had by Macy in September of that year. Hence, the court finds that the fair and reasonable value of this third floor addition on May 1,1962, to have been $100,000, which has been added to the value of the building.
The above factors, coupled with the lack of any evidence of actual sales to establish income of the petitioner, require the court to weigh carefully all of the evidence presented. From this and its own detailed inspections of the premises and the surrounding area, the court finds the fair values for the subject property, including land and improvements, for all of the years in issue to be:
Land Improvements Total
1957.............. ........... $1,000,000 $5,500,000 $6,500,000
1958.............. ........... 1,086,510 5,500,000 6,586,510
1959.............. ........... 1,267,595 5,500,000 6,767,595
1960.............. ........... 1,448,680 5,400,000 6,848,680
1961.............. ........... 1,629,765 5,350,000 6,979,765
1962.............. ........... 1,810,850 5,450,000 7,260,850
*575 Applying the ratio of 36% to these values results in the following corrected assessed valuations for land and buildings:
Land Total
1957 ......................................... $360,000 $2,340,000
1958 ......................................... 391,143 2,371,143
1959......................................... 456,334 2,436,334
1960 ......................................... 521,525 2,465,525
1961 ......................................... 586,715 2,512,715
1962 ......................................... 651,906 2,613,906
Submit order accordingly.

 This value does not take into consideration any additional value for the partially completed third floor as of May 1, 1962. This additional value is the structural replacement cost as appraised by Mr. Preston C. Brady, Engineer.