Howard T. Hogan, J.
These consolidated proceedings are brought under the Beal Property Tax Law to review the assessments levied for each of six tax years upon certain real property located in Nassau County and known as the Lake Success Shopping Center. The property is divided into several lots for tax purposes which total over 17 acres in area. The land is improved with two one-story and basement brick and cement block structures, containing 34 stores and one two-story and basement brick department store building, all of which are located on combined tax lots 56 and 75A. The main illuminated parking field is striped for 1,573 cars and is paved with macadam. The center enjoys an excellent location with two entrances on Union Turnpike, a main east-west artery, is in close proximity to the New York City line, and services a highly desirable residential area.
The parties to this proceeding have stipulated as to the ratios of assessed valuation to full market value for the years in question, which range from 33%% to 40%. The parcels are all located in section 8 of the tax map, and the lots in question, the assessed valuation, and the applicable ratios are as follows:
Tax Status Date Lot Land Total Ratio May 1, 1959 Block 235 Lot 56, 57A 364,993 1,744,500 40% May 1, 1960 Block 235 Lot 56, 57A 364,993 • 1,744,500 40%
*518 Tax Status Date Lot Land Total Ratio May 1, 1961 Block 235 Lot 56, 57A 364,993 1,744,500 39% May 1, 1964 Block 235 Lot 56, 57A Block 235 364,993 1,747,600 36% Lot 57B 26,140 26,140 36% Block 101 Lot 1 3,180 3,180 36% Block 104 Lot 13 2,240 2,240 36% May 1, 1965 Block 235 Lot 56, 57A Block 235 364,993 1,747,600 33%% Lot 57B 26,140 26,140 33%% Block 101 Lot 1 3,180 3,180 33%% Block 104 Lot 13 2,240 2,240 33%% May 1, 1966 Block 235 Lot 56, 57A Block 235 523,670 1,906,300 33%% Lot 57B 13,070 13,070 33%.% Block 101 Lot 1 Block 104 3,180 3,180 33%% Lot 13 2,240 2,240 33%%
In a tax certiorari proceeding, the valuation of the property is fixed by the assessor and reviewed by the court as of the tax status date, without regard to future potentialities.' This is a totally different concept than exists in eminent domain proceedings (see Matter of County of Nassau [North Hempstead Turnpike], 47 Misc 2d 593). In a condemnation proceeding, the court is bound to add increments to value for the proven potentialities of the property in the light of its highest and best use, now or in the future. Here, our sole question is the market value of the property oh the dates in question.
The ceiling for the real property assessment which may be levied upon a property is the sound value of its improvements added to the market value of the land (People ex rel. Manhattan Sq. Beresford v. Sexton, 284 N. Y. 145; People ex rel. Parklin Operating Corp. v. Miller, 287 N. Y. 126). To exceed this value is to place a premium, in effect an additional business tax, for its financially successful use. This ceiling value, however, may be reduced by proof that actual market value of the' entire property, based upon realities of the economic market, is less than its bricks and mortar ■ value. For that reason, both sides *519 have introduced evidence based upon the summation approach and the over-all capitalization approach.
The court will first explore the summation approaches, and has prepared the following chart setting forth the values proffered by both parties for comparison with the full value represented by the assessed values after the stipulated ratios are applied.
SUMMATION APPROACH
Petitioner Assessor Respondent
Tax Status
Date Lot Land Total Land Total Land Total May 1, 1959 56, 57A 745,290 3,843,490 912,482 4,361,250 1,262,558 5,417,558 May 1, 1960 56, 57A 828,100 3,807,680 912,482 4,361,250 1,298,631 5,648,631 May 1, 1961 56, 57A 910,910 3,769,010 935,879 4,473,076 1,334,704 5,794,704 May 1, 1964 56, 57A 1,159,340 3,751,290 1,013,869 4,854,444 1,523,924 6,222,905 57B 65,100 65,100 72,611 72,611 included in 56, 57A 1 5,810 5,810 8,833 8,833 15,458 15,458 13 5,775 . 5,775 6,222 6,222 14,376 14,376 TOTAL 1,236,025 3,827,975 1,101,535 4,942,110 1,553,758 6,252,739 May 1, 1965 56, 57A 1,324,960 3,798,300 1,094,979 5j242,800 1,562,012 6,237,046 67B 74,400 74,400 78,420 78,420 included in 56, 57A 1 6,640 6,640 9,540 9,540 14,819 14,819 13 6,600 6,600 6,720 6,720 14,735 14,735 TOTAL ' 1,412,600 3,885,940 1,189,659 5,337,480 1,591,566 6,266,600 May 1, 1966 56, 57A • 1,656,200 4,045,585 1,571,010 5,718,900 1,600,100 5,615,100 57B 93,000 93,000 39,210 39,210 included in 56, 57A 1 8,300 8,300 9,540 9,540 15,160 15,160 13 8,250 8,250 - 6,720 6,720 15,094 15,094 TOTAL 1,765,750 4,155,135 1,626,480 5,774,370 1,630,354 5,645,354
LAND VALUE
Petitioner’s real estate appraiser submitted 11 comparable sales. His concluded land values for the years in question reflect an acreage increase in valne of $5,000 per acre from 1959 to 1964, with exceptionally large increments in the valne on May 1, 1965 of $10,000 per acre, and of $20,000 on May 1, 1966. His conclusions, which the court has also divided into square foot values, are as follows:
Value
Tax States -
Date Per Acre Per Square Foot
May 1, 1959 $45,000 1.03 May 1,1960 50,000 1.15 May 1, 1961 55,000 ' ■ 1.26 May 1, 1964 70,000 1.61 May 1, 1965 80,000 1.84 May 1, 1966 100,000 2.30
. "While all of his sales were, in his opinion, of comparable properties, he felt that No. 5, a 1959 sale? was of great significance, as was sale No. 9, a 1963 sale.
*520 Number 5 involved a sale of 25 acres east of Belmont Park in Elmont and reflected a price of $42,500 an acre. It is similar to the subject property in its proximity to the city line, its location on a major artery and its commercial usage. It is located approximately two miles south of the subject property as the crow flies.
Sale No. 9, of 25 acres, to a department store, occurred in 1963 and reflects a price of $63,200 per acre. It is located about three quarters of a mile east of the subject property on a main artery. While it is further from the city line than sale No. 5 or the subject property, it enjoys access on two main roads, and retains attractiveness to New York City residents by virtue of the Long Island Expressway.
Respondent’s real estate appraiser also included the Elmont sale (Petitioner’s 5) as his sale No. 3. He agreed that it was reasonably comparable, but attached reduced significance to it because in his opinion the price of $42,500 is low. He testified that petitioner’s sale No. 9 actually supported respondent’s valuations because the land encompassed in that sale required a tremendous amount of fill and rock-work bulkheading. In addition, he asserted that the petitioner’s sale No. 9 was not as desirable a location for commercial development as was the subject property, although today it has become excellent. His estimates of value are set forth as follows; the court having transposed his figures into acreage value:
Value
Tax Status Date Per Acre Per Square May 1, 1959 76,230 1.75 May 1, 1960 78,408 1.80 May 1, 1961 80,586 1.85 May 1, 1964 87,120 2.00 May 1, 1965 89,298 2.05 May 1, 1966 91,476 2.10
Generally spealdng, petitioner’s comparable sales are more reliable than respondent’s, for they more closely parallel the subject parcel in size and location. Petitioner’s expert did not, however, detail each of his adjustments, which makes analysis of his sales difficult with respect to the subject parcel. Nevertheless, the court finds that petitioner’s estimate of value for 1959 is a valid one, predicated upon all of his sales and based especially on the sale included by both experts.
There is little to bolster petitioner’s position that the acreage value increased uniformly until 1964 and then exploded. The *521 court prefers respondent’s straight line appreciation in value and finds the increment at $7,500 per acre, or an approximate square foot value increment of 17.2 cénts per annum.
The resultant value per land unit for the years in question is as follows:
Tax Status Date Value Per Acre Per Square Foot May 1, 1959 45,000 1.03 May 1, 1960 52,500 1.202 May 1, 1961 60,000 1.374 May 1, 1964 82,500 1.891 May 1, 1965 90,000 2.062 May 1, 1966 97,500 2.234
Applying these values to the stipulated land areas in question produces the following land values for each year:
Tax Status Date Parcel Area Unit Price Value May 1, 1959 Block 235 Lot 56, 57A 16.562A 45,000 745,290 May 1, 1960 Block 235 Lot 56, 57A 16.562A 52,500 869,505 May 1, 1961 Block 235 Lot 56, 57A 16.562A 60,000 993,720 May 1, 1964 Block 235 Lot 56, 57A 16.562A 82,500 1,366,365 Block 235 Lot 57B 40,500 sq. ft. 1.891 76,586 Block 101 Lot 1 7,229 sq. ft. 1.891 13,670 Block 104 Lot 13 7,188 sq. ft. 1.891 13,593 TOTAL for 1964 May 1, 1965 Block 235 Lot 56, 57A 16.562A 90,000 1,470,214 1,490,580 Block 235 Lot 57B 40,500 sq. ft. 2.062 83,511 Block 101 Lot 1 7,229 sq. ft. 2.062 14,906 Block 104 Lot 13 7,188 sq.ft. 2.062 14,821
TOTAL for 1965
1,603,818
*522 522 55 MISCELLANEOUS REPORTS, 2d SERIES Tax Status Date Parcel Area Unit Price Value May 1, 1966 Block 235 Lot 56, 57A Block 235 16.562A 97,500 1,614,795 Lot 57B Block 101 40,500 sq. ft. 2.234 90,477 Lot 1 7,229 sq. ft. 2.234 16,149 Block 104 Lot 13 7,188 sq.ft. ' 2.234 16,058 TOTAL for 1966 ■ 1,737,479
IMPROVEMENTS
Petitioner’s building expert made a summary of the quantities of material and labor required for each component in the structures and calculated the sound value of the buildings as of May 1, 1965, the year in which he inspected the building. He included builder’s profit, fees and supervision at 3% each. He then utilized the United States Department of Commerce consolidated index to calculate the values for the years in question and he applied an over-all 4% depreciation factor per year. His conclusions are as follows:
Tax Status Cost of
Date Eeproduction Depreciation Sound Value
May 1,1959........................ 3,688,320 590,120 3,098,200
May 1,1960........................ 3,724,480 744,900 2,979,580
May 1, 1961...'..................... 3,760,640 902,540 2,858,100
May 1,1964........................ 4,049,920 1,457,907 2,591,950
May 1,1965......................... 4,122,232 1,648,892 2,473,340
May 1,1966 ......................... 4,266,760 .. 1,877,375 2,389,385
Respondent’s expert’s approach was basically the same. He, too, calculated the materials and labor necessary, and applied an index, The Engineering News Record Cost Indexes. He differentiated, however, between site improvements; such as paving, clearing, grubbing, excavation, sewage disposal and drainage on one hand, and building construction on the other and he assigned a separate depreciation.allowance for each of these broad categories. The sound value of the site improvements was reduced by 4.5% per annum, while the three structures were depreciated by assigning a separate allowance for each component part of each building, and interpreting the results into a weighted average depreciation for the unit in question. For example, in the year 1966 he depreciated the roofing on Unit 1, 67.7%; the cement work, 50%; the electrical work, 28%, and so forth. Then he combined all to reach a *523 weighted' depreciation of 30.7% for that building in that year, which he adjusted to a straight line depreciation of 3.2% per annum for Unit 1.
Similar calculations resulted in straight line depreciations of 3.3% per annum for the other two buildings. He then added depreciated increments for interest on land value (6%), fees (5%), builder’s profit (5%), and interest on money (6%). His calculations may be summarized as follows:
Total Estimated
Tax Status Replacement Total Sound
Date Costs Depreciation Value
May 1,1959.......■.................. 5,224,152 386,268 4,838,000
May 1,1960 ........................ 5,419,470 575,515 4,844,000
May 1,1961............. 5,512,700 762,194 4,750,000
May 1,1964......................... 6,086,570 1,432,008 4,655,000
May 1, 1965......................... 6,319,490 1,691,468 4,628,000
May 1,1966............. 6,538,969 1,989,335 4,550,000
The petitioner’s expert did not include piling which was required, nor any allowance for a temporary sewer system, striping and marking the parking lot, or sign stanchions. It was stipulated that his expert testimony in the so-called Roosevelt Field case (Matter of R. H. Macy & Co. v. Podeyn, 48 Misc 2d 566, affd. 26 A D 2d 773) could be read in conjunction with his testimony in this matter, and several inconsistencies are pointed out by the County Attorney. For example, his unit costs for concrete footings and walls, common brick, sheet metal and gypsum slab are the same in that 1962 proceeding as the ones proffered here for 1965 unit costs, notwithstanding a 12.6% increase in these unit costs over the 1962A35 period. Similarly, his building cost index in Roosevelt Field was 2.95 between 1959 and 1960 and 0.98 for the same years in this proceeding.
In the court’s opinion, these inconsistencies and the record as a whole lend little credence to this expert’s conclusions. In addition, one cannot disregard the several elements mentioned above which were and are necessary to construct this center.
The court therefore adopts the basic reproduction costs as set forth by respondent, including the 5% for fees and an additional 5% for the builder’s combined expenses and profit. The amount attributed to interest on the land is rejected, for this amount would more properly be included in an economic valuation.
The court does not adopt respondent’s separate depreciation factors ranging from 3.2% per annum to 4.5%, because of the inherent dangers in attempting to evaluate and adjust each of *524 the multitudinous judgment factors that have resulted in the asserted weighted depreciation. In addition, this approach does not consider the over-all functional obsolescence which both sides admit is present, due to the ‘limitation on parking (seeMcAnarney v. Newark Fire Ins. Co., 247 N. Y. 176, 185; Lee and LeForestier, Review and Reduction of Real Property-Assessments, § 1:07, p. 5). The court adopts petitioner’s straight line 4% per annum (%% per month) depreciation.
■The court adopts January 1, 1957, as the completion date for purposes of calculating depreciation. Therefore, May 1, 1959, the per cent of accrued depreciation is .0933%. It should be pointed out that the court adopts petitioner’s testimony that a structure of this type depreciates in straight line .manner and should then level out when the improvements are approximately 40% depreciated.
The court’s calculations are as follows:
Tax Status Date Reproduction Cost All Improvements Fees and Accrued Profit Depreciation Sound Value May 1, 1959 4,547,138 454,714 466,673 4,53-5,179 May 1, 1960 4,719,000 471,900 691,947 4,498,953 May 1, 1961 4,799,000 479,900 914,833 4,364,067 May 1, 1964 5,299,000 529,900 1,709,616 4,119,284 May 1, 1965 5,503,000 550,300 2,017,565 4,035,735 May 1, 1966 5,694,630 569,462 2,338,385 3,925,707 The value of the land and improvements on the dates in question is therefore found to be as follows: Tax Status ■ Date Parcel Land Total May 1, 1959.... Lot 56, 57A 745,290 5,280,469 May 1, 1960. . . ... Block 235 Lot 56,.57A 869,505 5,368,458 May 1, 1961____ ,.. Block 235 Lot 56, 57A 993,720 5,357,787 May 1, 1964____ ... Block 235 Lot 56, 57A 1,366,365 5,485,649 Block 235 Lot 57B 76,586 76,586 Block 101 Lot 1 13,670 13,670 Block 104. Lot 13 13,593 13,593 TOTAL for 1964 1,470,214 5,589,498
*525 Tax Status Date Parcel Land Total May 1, 1965................ ........... Block 235 Lot 56, 57A 1,490,580 5,526,315 Block 235 Lot 57B 83,511 83,511 Block 101 Lot 1 14,906 14,906 Block 104 Lot 13 14,821 14,821 TOTAL for 1965............ 1,603,818 5,639,553 May 1, 1966................. Lot 56, 57A 1,614,795 5,540,502 Block 235 Lot 57B 90,477 90,477 Block 101 Lot 1 16,149 16,149 Block 104 Lot 13 16,058 16,058 TOTAL for 1966............ 1,737,479 5,663,186
A comparison of these values with the calculated full valuations of the assessor demonstrates that all the assessed valuations must be confirmed under the summation approach with the exception of the 1966 valuation.
CAPITALIZATION APPROACH
Both of the experts in this field approached the economic valuation by applying an over-all rate to income, to arrive at an over-all value and to then adopt the land values asserted by their respective colleagues. Of prime interest, therefore, are their over-all valuations, which are summarized as follows and which are compared with the calculated total value of the assessor:
Tax Status
Date Petitioner Assessor Respondent May 1, 1959.............. ............ 4,200,000 4,361,250 5,473,600 May 1, 1960.............. ............ 4,300,000 4,361,250 5,706,000 May 1, 1961............... ............ 4,450,000 4,473,076 5,858,100 May 1, 1984.............. ............ 4,070,000 4,854,444 6,343,981 May 1, 1965.............. ............. 4,200,000 5,337,480 6,360,034 May 1, 1966.............. ............. 4,180,000 5,774,370 5,740,000
*526 Petitioner’s expert capitalized the “cash flow profits” for each year. He arrived at the amount of these profits by adjusting the income and expense statements. The most noteworthy deduction was of all overage rents paid by non-AAA tenants. He also stabilized the rental of two tenants at $1.25 per square foot.
His reasons for stabilizing a rental paid by Masters was because the tenant had a history of financial problems and because of the high reflected reserved rent of $1.44 per square foot for 54,180 square feet, of which almost half is basement space. This stabilization reduces his cash flow return by $10,275 per year.
The other stabilized rental is reserved in a relatively short-term lease to Sperry commencing in 1964 and terminating at the end of this year, which, in his opinion, also called for a high rental (which reflects $1.73 per square foot) for an area of 25,880 square feet, of which 18,080 square feet is basement area. This stabilization reduced his annual cash flow return by $12,650.
He utilized the actual taxes paid in calculating his adjusted net income, and selected a capitalization rate of 10% for the years 1959-60 and 1961, and of 12% for 196F-65 and 1966.
Respondent’s appraiser utilized the actual income and expense statements and deducted an additional factor for management due to the present owner management of the property. His figures included all overages paid by all tenants and actual, not stabilized, rentals.
He chose capitalization rates of 8% for 1959 and 1964; 8.2% for 1960,1961 and 1965, and 8%% for 1966. The rate was chosen based upon amounts required for debt service and for equity return, which was the same approach utilized by petitioner. This appraiser, however, explained that he did not use a build-up capitalization rate because of the difficulty in establishing a risk factor. He did, however, check his over-all capitalization rate by breaking the income down into component parts which were assigned different rates. For example, for May 1, 1959, he chose .0775 for the minimum net income, excepting J. C. Penny’s rental, which is based on volume percentage. For Penny’s, he selected .0825 and for overage rentals .1050.
Since the taxes are the substance of this proceeding, he added the capitalized tax rate to his over-all rate rather than use the actual taxes paid as a deduction from gross income. Such approach was adopted by this court in Matter of Cedar Park Terrace v. Board of Assessors (N. Y. L. J., June 17, 1964, p. 16, *527 col. 7, affd. sub nom. Matter of Cedar Park Terrace v. Voehl, 19 A D 2d 697).
The elimination of the overages from local tenants as part of the income is a totally unwarranted and unjustified assumption by the petitioner’s witness, and his arbitrarily selected 10% or 12% capitalization rates are not supported by the proof.
In the court’s opinion, the testimony of respondent’s expert, Whitman, is more believable, his results better buttressed by checks, and his conclusions far more accurate than that of the petitioner’s witness.
The court disagrees only with Whitman’s handling of the Sperry rental. The Sperry situation is not a long-term lease, and the rent reserved is high. It is logical that Sperry, located on a huge parcel across Union Turnpike from the subject property, requiring additional space, would pay a premium for the location in the center convenient to them. While it is true that there is little risk of the reserved rental not being paid while Sperry is a tenant, there is little probability of obtaining another tenant upon the same or similar terms.
The remaining contentions of the petitioner, however, have been more than adequately explained or expelled by the respondent. The court will therefore reduce the net rental for the years 1964, 1965 and 1966 by $12,650.
The court then calculates the over-all value for the shopping center as follows:
Tax Rate For Overall
Tax Status Bate Net Income Before Taxes Capitalization Rate Capitalization Rate Economic Value May 1, 1959...... 616,360 .08 .03914 5,173,409 May 1, 1960..... 642,209 .082 .03970 5,276,984 May 1, 1961..... 664,470 .082 .04032 5,432,226 May 1, 1964.. ... 716,211 .080 .04151 5,894,255 May 1, 1965..... 721,002 .082 .04068 5,877,094 May 1, 1966..... 725,472 .0825 .04615 5,639,114
A comparison of the court’s various calculations reveals that the true value reflected by the assessment is an accurate one for all years in question with the exception of the value established on May 1, 1966, under the summation approach value.
Accordingly, all assessments are confirmed with the exception of the 1966 valuation for the improved parcel, which, at the stipulated ratio of 33%%, shall be established by respondent at:
Parcel Land Total
Block 235
Lot 56, 57A 538,265 $1,846,834